THE CITY OF CHICAGO *et al.*, Plaintiffs-Appellants, *v.* ANTHONY ROPPOLO *et al.*, Defendants-Appellees.

First District (2nd Division)   Nos. 81—1167, 81—1168, 81—1685 cons.

Opinion filed March 22, 1983.—Rehearing denied April 28, 1983.

STAMOS, J., dissenting.

Stanley Garber, Corporation Counsel, of Chicago (Robert R. Retke and Richard F. Friedman, Assistant Corporation Counsel, of counsel), for appellants.

Andrew M. Raucci, of Kusper & Raucci Chartered, of Chicago, for appellee Anthony Roppolo.

Brydges, Riseborough, Morris, Franke and Miller, of Chicago (George E. Riseborough, of counsel), for appellees Cirro Wrecking Company, Inc., and Lela Cirrincione.

PRESIDING JUSTICE DOWNING delivered the opinion of the court:

This action arises from the demolition of the Henry W. Rincker House, a two-story frame residence on Chicago's far northwest side, which had been declared a landmark by the Commission on Chicago

Historic and Architectural Landmarks (Landmark Commission).

Plaintiffs, the city of Chicago and a class comprised of all its citizens, brought this action for the imposition of a constructive trust on the property on which the house stood and for damages. The constructive trust was to be measured by the extent of the savings in restoration costs to Anthony Roppolo, the property owner, generated by the house's demolition. In addition to Roppolo, the suit named as defendants the Northwest National Bank of Chicago, as trustee under trust agreement dated March 1, 1978, and known as Trust 4525, Cirro Wrecking Company (Cirro), the wrecking company which performed the demolition, and Lela Cirrincione, the owner of Cirro. After a bench trial, the trial court held that plaintiffs failed to prove any of the defendants guilty of a fraud or that any defendant had breached a fiduciary duty, and that plaintiffs had not proved damages or established their right to a constructive trust. The pertinent evidence, some of which was stipulated to, may be summarized as follows.

In March 1978, defendant Anthony Roppolo and a business partner purchased over five acres of land located at the intersection of Devon, Milwaukee and Nagle avenues in Chicago. The property was improved with seven structures: two grocery stores, a drug store, a laundromat, a hamburger stand, the Rincker House and the tool shed adjacent to the house. The Rincker House was occupied at the time of purchase, but thereafter vacated and the windows boarded. Roppolo was a 50% owner and agent of the land trust which paid $1,600,000 for the property. In early April of 1978, Roppolo entered into a contract with Joseph Romono to demolish the Rincker House. The application for a demolition permit showed the address of the house at 6366 North Milwaukee Avenue. The application was processed through the various city departments which must approve any demolition permit. On May 1, 1978, the commissioner of the Department of Buildings notified Romono that the permit would not be issued. The owners' complaint for a writ of *mandamus* against the commissioner was dismissed by the trial court. An appeal from the trial court's action was dismissed by this court for want of prosecution. In July 1978, the city, with the consent of Roppolo, demolished the shed on said property.

On June 5, 1978, the Landmark Commission voted to begin proceedings to have the property, including the Rincker House, declared an official Chicago landmark. Roppolo was represented during these proceedings by an attorney. On April 10, 1979, the Landmark Commission recommended to the city council that the property, including

the Rincker House, be designated as a landmark. On August 10, 1979, the city council passed an ordinance designating the property, including the Rincker House, as a Chicago historical landmark.

In April of 1979, Romono, on behalf of Roppolo, applied the second time for a permit to demolish the house. A permit was issued on May 7, 1979, and revoked on the same day by the commissioner of the Department of Buildings.

On February 29, 1980, Roppolo applied for a zoning amendment in order to develop the tract on which the house stood. Hearings on the proposed amendment were held on July 10, 1980, by the Chicago plan commission. The application was modified by the agreement of Roppolo and the plan commission to include a provision that Roppolo would retain the house as a designated Chicago Landmark, move it to another part of the tract, and restore and reconstruct the house at the direction of the Landmark Commission. This development was to be known as "Landmark Square." The plan commission then approved the modified plan of development.

Prior to July 30, 1980, Roppolo asked Mario Rizzi to inquire of various demolition contractors whether any of them would be willing to apply for a permit to demolish the Rincker House. Rizzi spoke to Cirro. Mrs. Cirrincione, owner of Cirro, agreed to apply for a permit only if the company was given a contract to perform the actual demolition. Roppolo thereupon authorized Rizzi to enter into the contract with Cirro for the demolition of the house. Thereafter, Mrs. Cirrincione began the application process.

On July 30, 1980, Mrs. Cirrincione went to the permit control desk of the city's Department of Inspectional Services, Plans, and Examinations (formerly the Department of Buildings) with a partially completed application for a demolition permit. Annette Bueck, an employee of the department, made an entry in the permit application received log showing the receipt of a permit application to demolish the building at 6366 North Milwaukee Avenue. Mrs. Cirrincione then went to the Department of Streets and Sanitation to register the application. That department requires a two-day notice before a sidewalk permit can be issued. No demolition permit can be issued without a sidewalk permit.

Shortly after these preliminary steps in the application process were completed, Alderman Roman Pucinski, in whose ward the property is located, received notice of the application to demolish the structure at 6366 North Milwaukee. Pucinski telephoned the permit control desk to inquire about the application and was informed that the structure was a landmark and that no permit would be issued. At

about the same time, Philip Margolis, a city sidewalk inspector, visited the demolition site. He found no structures bearing the address 6366 North Milwaukee in the area, then telephoned his office for a more detailed description of the building to be wrecked. Margolis was finally able to determine that the structure to be demolished as a wood-frame structure bearing signs identifying it as a landmark.

Mrs. Cirrincione received an executed contract for the demolition work prior to August 20, 1980. On that date, she went to the demolition site and took the photograph of the structure to be demolished which must accompany all demolition permit applications. This photograph of the house was submitted with the application. It was last seen in the possession of a city employee. It was not produced during pretrial discovery or at trial. On the same day, Mrs. Cirrincione went to Roppolo's office, showed him the application for the permit and gave him a letter of authorization which required his signature. She also asked him if she should use the 6366 address on the application. She said that she had observed that the addresses of the other buildings on the tract were 6374 through 6382, and that the house must be numbered out of sequence, as the other buildings all stood to the south of the house. She asked Roppolo if the proper house number shouldn't be higher than 6382. Roppolo stated that the address that should be used was 6366, and then signed the application[1] and authorization letter with that address. At the same time, Roppolo provided Mrs. Cirrincione a legal description of the property and the number of water cutoff and dust control permits obtained by Roppolo in his previous attempts to obtain a demolition permit for the house.

Mrs. Cirrincione then went to city hall. She obtained permits of approvals that were necessary to process the application from the Sewer Department, Streets and Sanitation, the Water Department, the Environmental Control Section, the Flammable Liquid Tank Section, the Zoning Department, and the Map Department. In the Map Department, the location of 6366 North Milwaukee Avenue was plotted on the official city map. The employees of the Map Department determined that 6366 was not the correct address of the house, then issued a house certificate bearing the address 6384 North Milwaukee Avenue. It was not unusual for the addresses on applications to be changed in this manner during processing. There was testimony that

---

[1]The application which bears the signature of Roppolo contains the following language immediately above the signature: "[W]e hereby certify that the statements in the application are true and correct to the best of our knowledge and belief, and that all work under the proposed permit will conform to the Municipal Code of the City of Chicago."

6366 North Milwaukee was the house number affixed to the tool shed which had stood adjacent to the Rincker House until the city caused the shed to be demolished. Mrs. Cirrincione took the house number certificate, the corrected application with other documents to the Demolition Department and received an approval of the permit application.

Mrs. Cirrincione then returned to the permit control desk. She gave all the documents to Helen Cowell, a Department of Inspectional Services employee, who was assigned the duty of processing applications for building and demolition permits at the permit control counter. She calculated the permit fee, had it checked and organized the permit papers. She gave the papers to Annette Bueck, another employee assigned at the counter who passed the papers back to the remote terminal operator, whose terminal is located behind the permit control counter.

The remote terminal operator's job is to type the street address and other information contained on a permit application into the computer. If the address of a designated landmark is entered from the terminal, the computer will buzz and the work "landmark" will appear on the screen. No further information can be entered unless the operator manually overrides the system. If the address entered is not listed as a landmark, all the information from the application can be entered and the computer will print out the permit. On the application at issue, a line had been drawn through the number 6366 and the number 6384 was written above it. The operator entered the 6384 number, and the computer printed out Permit No. B586952, which permit gave Cirro permission to demolish the two-story frame structure at that address.

Five days later, employees of Cirro demolished the Rincker House. The application for a demolition permit was never reviewed by the Landmark Commission.

The Rincker House, built in 1851, was the second oldest building in Chicago, and the oldest example of the "balloon frame" construction method which originated in Chicago. It was also an example of the architectural style known as "carpenter gothic." Signs were attached to the house identifying it as a landmark, with one sign being approximately three feet by four feet. Several witnesses testified that the signs were always attached to the house during the summer of 1980, although other testimony indicated that vandals would occasionally remove the plywood window coverings to which the signs were attached in order to enter the house. Alfred Cirrincione, the bulldozer operator who wrecked the house, testified that he did not see the

signs before wrecking the building, and that the plywood window coverings were lying on the ground around the house when he arrived on the site. Two neighbors testified that they had spoken to Alfred after the demolition and that he had made statements indicating that he had been told to expect landmark signs and that he was to ignore them.

Mrs. Cirrincione testified that she had never been told that the building was a landmark, and that she had seen no signs when she had visited the site to take the photograph for the application. She also testified she did not inform anyone at City Hall that the building was a landmark. Mrs. Cirrincione also testified that she called Commonwealth Edison (the electric company) to instruct it to remove its equipment from the site. The electric company maintains a record of customer calls known as the "terminal transaction record" which memorialized a call on August 21, 1980, at 3:57 p.m. from Mrs. Lee Cirro (Mrs. Cirrincione's business name) from the telephone number of Cirro, who stated, "Cirro Wrecking Co. will be demolishing two-story, green frame building on Monday, 8/25/80 at approximately 8:00 a.m.—requests removal of CECO [Commonwealth Edison Co.] equipment—customer warns there are four buildings on lot—remove equipment from building with Chicago Historical Landmark sign on it."

Testimony on behalf of the city indicated that to reconstruct the Rincker House and move it to a new location on the five-acre site would cost approximately $200,000 to $250,000; that the demolition of the Rincker House had an adverse effect on the neighborhood surrounding the house and resulted in a loss to Chicago's cultural and aesthetic heritage. On the other hand, Roppolo offered the testimony of a real estate appraiser that the demolition of the house had no effect on real estate values in the neighborhood or the city. Roppolo testified that the destruction of the Rincker House and the continuing debt service and attorney fees had cost him $325,000 between the date of demolition and the trial.

Plaintiffs appeal, contending that the proofs presented at trial established that defendants demolished the Rincker House without authority; that defendants are guilty of fraud, and that damages to plaintiffs were proved. Defendants filed a cross-appeal contending, amongst other things, that the trial court erred in not granting a change of venue, in denying their request for a jury trial and other relief.

I

The foremost issue in this appeal is whether a constructive trust

arises by operation of law as the result of the actions, either jointly or severally, of defendants Roppolo, Cirro and Mrs. Cirrincione in demolishing the Rincker House, a Chicago landmark. In order to answer this question, we must first review some general principles of law and then examine the facts in the record.

Plaintiffs say that the defendants without authority wilfully demolished a landmark, thereby causing damages. The trial court held that the evidence did not clearly and convincingly prove any of the allegations of the complaint.[2]

In *County of Cook v. Barrett* (1975), 36 Ill. App. 3d 623, 627, 344 N.E.2d 540, *appeal denied* (1976), 63 Ill. 2d 555, this court said, "[t]he particular circumstances in which equity will impress a constructive trust are '*** as numberless as the modes by which property may be obtained through bad faith and unconscientious acts.' (4 Pomeroy's Equity Jurisprudence §1045, at 97 (5th ed. 1941).) The barriers to its effective operation are few. The form of the property claimed determines nothing, since a constructive trust will extend to reach real and personal property, choses in action and funds of money. (4 Pomeroy's Equity Jurisprudence §1044 (5th ed. 1941).) To make out a case a plaintiff must allege facts which disclose either actual or constructive fraud or an abuse of a confidential relationship."

The way in which a transaction assailed in constructive trust cases arises is immaterial. (*Village of Wheeling v. Stavros* (1980), 89 Ill. App. 3d 450, 455, 411 N.E.2d 1067, *appeal denied* (1981), 82 Ill. 2d 588.) In determining whether to impose a constructive trust, we should consider the principles of equity, good conscience and unjust enrichment, if any. (*Cf. Zack Co. v. Sims* (1982), 108 Ill. App. 3d 16, 29, 438 N.E.2d 663.) As we noted in *Chicago Park District v. Kenroy, Inc.* (1982), 107 Ill. App. 3d 222, 224, 437 N.E.2d 783, "[t]he recent trend in the Illinois law of constructive trusts has been a broadening of the circumstances in which this remedy is available."

Plaintiffs claim the court has the authority to compel defendants to pay a sum of money equal to that sum of money saved by Roppolo as the result of the demolition of the Rincker House, thereby eliminating his obligation to the city to move, reconstruct and restore said landmark. Thus, if the city can prove its theory, we think the right is one of those rights referred to in *Barrett, Stavros,* etc.

---

[2]The cause was tried as a duly certified class action brought on behalf of the citizens of Chicago. Although defendants Cirrincione and Cirro challenge the standing of the individual plaintiffs, the resolution of that question is not determinative of the rights of the city.

Plaintiffs claim defendants wilfully, intentionally and without authority demolished a landmark, and that in so doing the defendants are guilty of fraud. In order to determine the validity of plaintiffs' claim, we shall analyze and evaluate the separate conduct of each defendant.

### A

We first consider defendant Roppolo. He was associated with Roppolo-Prendergast Builders, developers and builders, with offices at 6315 North Milwaukee Avenue, Chicago.[3] In March 1978, Roppolo and Prendergast purchased the approximately five acres of real property on which the Rincker House was then located. Title to the property was placed in a land trust with the Northwest National Bank of Chicago, Roppolo and Prendergast each owning 50% beneficial interest. Prendergast is not a party in this litigation, and there is nothing in the record to suggest he was more than nominally involved.

About April 3, 1978, shortly after the purchase of the property, Roppolo caused one Joseph Romono to file with the city an application for a permit to wreck a building at 6366 North Milwaukee Avenue. The building to be demolished was the Rincker House. On May 1, 1978, the city advised that the demolition permit would not be issued. Thereupon, Roppolo and Prendergast commenced a *mandamus* action in the circuit court of Cook County which was dismissed on June 16, 1978. An appeal to this court was dismissed for want of prosecution.

On June 5, 1978, proceedings were commenced to designate the Rincker House and the tract of property on which it was located as an official Chicago historical and architectural landmark. Roppolo was represented by an attorney who appeared at the landmark proceedings. After a recommendation by the Landmark Commission on April 10, 1979, the Chicago city council on August 10, 1979, by ordinance, designated the Rincker House as a Chicago historical landmark. Roppolo opposed the designation throughout. He also testified that he knew that upon designation of a building as a landmark, thereafter permission to demolish the building had to be obtained from the Landmark Commission. In 1979, signs appeared on the house identifying it as an "Official Chicago Landmark."

During the pendency of the landmark proceedings, Joseph Romono, on behalf of Roppolo, in April 1979 filed with the city a second application for a demolition permit which was issued by the city on

---

[3]Roppolo's office was located in the same block as the Rincker House, but across Milwaukee Avenue, a wide, heavily traveled thoroughfare.

May 7, 1979, and revoked on the same date.

On February 29, 1980, Roppolo filed with the city an application for an amendment to its zoning ordinance. Specifically the amendment requested approval of a planned development to be called "Landmark Square" and provided for relocating the Rincker House in the corner of the property. It was referred to the Chicago Plan Commission for a public hearing.

On July 10, 1980, during the course of the plan commission public hearings on the proposed amendments for "Landmark Square," Roppolo agreed, through his attorney, to the following language to be included in the application:

> "9. Roppolo-Prendergast Builders, Inc. will retain the Rincker House, a designated Chicago Landmark, and will move the House to the landscaped site designated in the attached site plan. Roppolo-Prendergast Builders, Inc. will reconstruct the House. The movement, reconstruction and use of the House will be subject to the approval of the Commission on Chicago Historical Landmarks and may be modified with the approval of said body; ***."[4]

Notwithstanding all of the preceding action, around July 10, 1980, Roppolo authorized one Mario Rizzi to find a demolition contractor to apply to the city for a demolition permit to demolish the Rincker House. There is evidence in the record that Roppolo made the application to protect his legal rights. Around July 30, 1980, Rizzi secured Mrs. Cirrincione to agree to apply for a permit only if there was a contract to demolish the structure. Roppolo agreed to that and authorized a contract with Cirro to demolish the Rincker House. In fact, Roppolo signed a "Letter of Authorization" to Cirro to wreck the building. Thereupon, Mrs. Cirrincione applied to the city for a demolition permit, which application contained the signature of Roppolo as the owner.

During the application procedure, questions were raised as to the exact address of the house. The application, dated July 30, 1980, indicated 6366 North Milwaukee Avenue.[5] Roppolo advised Mrs. Cirrincione to use that number and provided a legal description. During the application processing, the Map Department of the city identified the

---

[4]The dissent notes this agreement does not specifically state Roppolo would pay the costs of moving and restoring. Although we agree the word "costs" is not literally included, we fail to understand how the work entailed by such acts can be done without "costs."

[5]The dissent suggests by using the address 6366 "Roppollo was under no duty to disclose more." This disregards his specific duty to the Landmark Commission.

property as 6384 North Milwaukee Avenue. As the landmark was designated 6366 North Milwaukee Avenue, a demolition permit was issued on August 20, 1980, notwithstanding the application to demolish the Rincker House was never submitted to or reviewed by the Landmark Commission prior to the demolition of the house. The application having been issued on Wednesday, August 20, 1980, the Rincker House was demolished about 9 a.m. on Monday, August 25, 1980.

The record clearly established (1) that Roppolo had knowledge the Rincker House was designated a landmark; (2) that Roppolo knew approval by the Landmark Commission was necessary to demolish a landmark; (3) that Roppolo neither applied to the Landmark Commission for approval to demolish or directed Mrs. Cirrincione, on his behalf, to apply; (4) that in consideration for the approval of pending rezoning of the Landmark Square, Roppolo agreed to move and reconstruct the house which, along with the use, would be subject to the approval of the Landmark Commission; (5) that Roppolo in authorizing the demolition promised to comply with the Municipal Code of the city; (6) that there would be a cost to move and reconstruct the Rincker House which would be approximately $200,000 to $250,000; and (7) that application to demolish had been twice refused. Knowing all of the aforesaid, Roppolo nevertheless concealed from the Landmark Commission his intent to demolish a landmark. Then he caused the action which resulted in the demolition of the Rincker House in violation of his promises, and also in violation of the requirement that the permission of the Landmark Commission was required before demolition would proceed. By so doing, he caused the injury to the city by the unlawful destruction of the landmark.

We consider Roppolo's conduct to have been irresponsible, in utter disregard of the law and his commitments to the city. During the period Mrs. Cirrincione was attempting to secure the permit, she and Roppolo admittedly discussed the address question. Placing that in its best light, it is obvious Roppolo was aware that he had everything to gain and nothing to lose by having Mrs. Cirrincione, as his agent, seek a demolition permit. Immediately following the issuance of the permit, Mrs. Cirrincione called the gas, electric and telephone companies, and went to the Illinois Department of Transportation offices for permits to transfer her equipment from its garage to the property. Yet, Mrs. Cirrincione testified that after obtaining the permit, she never advised Roppolo.

■ We think the facts clearly indicate Roppolo acted in bad faith in that he used Mrs. Cirrincione to obtain the permit to demolish, knowing that he had a continuing duty to move and reconstruct the

landmark. Roppolo knowingly and wilfully triggered the demolition, by agreeing to pay $4,000 to demolish that which he knew he was obligated not to demolish, thereby saving a large amount of money estimated to be approximately $200,000 to $250,000. Roppolo, by using Mrs. Cirrincione, was ready to, and willingly, accepted the benefits of the erroneously issued permit. This is the type of action in which equity, good conscience and the prospective unjust enrichment (by not having to fulfill his obligation) demands the imposition of a constructive trust.

We think the facts as to Roppolo can be characterized as either fraud or constructive fraud. *In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 568, 378 N.E.2d 1345, this court discussed "fraud" and "constructive fraud." (See *Gary-Wheaton Bank v. Burt* (1982), 104 Ill. App. 3d 767, 773-74, 433 N.E.2d 315.) Fraud is a generic term, embracing all multifarious means which human ingenuity can devise, and which are resorted to by one individual to get advantage over another by false suggestions or by suppression of truth, and includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated. It comprises all acts, omissions, and concealments involving a breach of a legal or equitable duty and resulting in damage to another. Black's Law Dictionary 594-95 (5th ed. 1979).

In *People ex rel. Chicago Bar Association v. Gilmore* (1931), 345 Ill. 28, 46, 177 N.E. 710, our supreme court said, "fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence." We think Roppolo's conduct meets the definition of "fraud."

Constructive fraud consists in any act of commission or omission contrary to legal or equitable duty which operated to injure another, which if generally permitted would be prejudicial to the public welfare. (Black's Law Dictionary 595 (5th ed. 1979).) We think Roppolo's conduct can also be classified as a "constructive fraud."

Roppolo falsely led Mrs. Cirrincione to believe that he was entitled to a demolition permit, falsely induced the city, through Mrs. Cirrincione acting as his agent, to issue a permit to demolish a landmark without the approval of the Landmark Commission, and falsely omitted, through his agent, to advise and inform the city employees of the agreement he had with the city to move and reconstruct the building for which he sought the demolition permit. We think that his acts, and those of his agent, were intended to deceive the city employees for Roppolo's gain and to the detriment of the plaintiffs.

Roppolo failed to act when he had a duty to secure the permission of the Landmark Commission prior to any demolition. By using Mrs. Cirrincione, he was able to conceal the true facts and was the willing beneficiary for his financial gain, of the administrative error which occurred in issuing the permit. The conduct of Roppolo and Mrs. Cirrincione had a detrimental effect upon public interest and public confidence in city government.

Mrs. Cirrincione was acting as agent for Roppolo for the specific purpose of securing the permit and demolishing the building. By failing to disclose to the city employees that the address involved was a landmark, Mrs. Cirrincione, as Roppolo's agent, concealed a material fact. It is well established that the principal may be liable to third persons for wrongful or tortuous acts committed by his agent at his direction or while acting within the scope of his authority. Mrs. Cirrincione's failure to disclose a material fact with intent to mislead in order to obtain the permit amounted to fraudulent concealment. Roppolo cannot hide behind the acts of Mrs. Cirrincione or Cirro. The acts of the agent are imputable to the principal. 1 Ill. L. & Prac. *Agency* secs. 181–182 (1953); see *United States v. Fox Lake State Bank* (N.D. Ill. 1965), 240 F. Supp. 720, 722, *aff'd in part, rev'd in part on other grounds* (7th Cir. 1966), 366 F.2d 962.

As the result of the actions which Roppolo triggered, the Rincker House was demolished. The city was damaged as the result of the destruction of the landmark. The city established the Commission on Chicago Historical and Architectural Landmark for the purpose of, amongst other things, designating buildings having a special historical, community, or aesthetic interest or value as "Chicago Landmarks" to preserve, protect, enhance, rehabilitate and perpetuate the designated landmarks. (1981 Municipal Code of Chicago, ch. 21, sec. 21–64 *et seq.* (1981).)[6] Thus, the city in order to enhance the cultural and historical environment elected to officially designate the Rincker House as a Chicago Landmark. The destruction of the building frustrated the city's action and diminished the cultural and historical quality of the city. It is to be remembered the Roppolo demonstrated his awareness of the benefit of a landmark designation by identifying his proposed redevelopment as "Landmark Square."

---

[6]The dissent discusses the financial burden imposed on landowners by the designation of property as a landmark, along with procedures to be followed by the Landmark Commission and city council upon the filing of an application to alter or demolish a landmark. As no application was ever filed with the Landmark Commission, we question the relevance of that discussion.

## B

Defendant Roppolo argues that the judgment of the circuit court is not against the manifest weight of the evidence. The trial court held that as to all defendants, the evidence failed to prove fraud, a breach of fiduciary duty, a constructive trust or damages of any kind.

It is elementary that a reviewing court will not disturb a trial court's finding and substitute its own judgment unless the holding of the trial court is manifestly against the weight of the evidence. On the other hand, it is our duty as a reviewing court to reverse any judgment wherein the findings are clearly and palpably against the manifest weight of the evidence. (*Drovers National Bank v. Great Southwest Fire Insurance Co.* (1977), 55 Ill. App. 3d 953, 956, 371 N.E.2d 855, *appeal denied* (1978), 71 Ill. 2d 602.) As to the defendant Roppolo, for the reasons set out in this opinion, we find the trial court's findings clearly and palpably against the manifest weight of the evidence.

## C

Defendant Roppolo further urges that he was under no duty to insure that the city's employees properly performed their jobs and followed its own procedures. And, as it issued the permit, the city was estopped from bringing the instant action. (*Cities Service Oil Co. v. City of Des Plaines* (1961), 21 Ill. 2d 157, 171 N.E.2d 605.) Roppolo argues, rather imaginatively that, as he was required by ordinance to apply for a permit, it would be inequitable to impose a constructive trust when the city issued the permit.

Roppolo's estoppel argument is without merit. The Chicago Landmark Ordinance (section 21—64.1(a)) required the approval of the Landmark Commission in order to obtain a permit. This was not obtained. The fact is the permit was issued by virtue of an incorrect street address being placed on the application in the city Map Department.

In *O'Laughlin v. City of Chicago* (1975), 28 Ill. App. 3d 766, 772, 329 N.E.2d 528, *aff'd* (1976), 65 Ill. 2d 183, 357 N.E.2d 472, we discussed the issue of estoppel at great length and examined the supreme court's opinion in the *Cities Service Oil Co.* case. The supreme court also discussed this issue and the *Cities Service Oil Co.* case in affirming *O'Laughlin.* (See 65 Ill. 2d 183, 192.) The subject of estoppel has also been discussed in other cases. (*E.g., Sharrett v. Campbell* (1982), 109 Ill App. 3d 1, 6—10, 440 N.E.2d 167; *Hagee v. City of Evanston* (1980), 91 Ill. App. 3d 729, 733-34, 414 N.E.2d 1184, *appeal*

*denied* (1981), 83 Ill. 2d 570; and *Ganley v. City of Chicago* (1980), 81 Ill. App. 3d 877, 881-82, 401 N.E.2d 1184.) Estoppel generally arises against a municipality in two situations: (1) where there is a substantial change of position under a permit validly issued which is later revoked due to a subsequent change in the law; or (2) where there has been a substantial change of position under an invalid permit and the party to whom the permit was issued was actively induced or misled by city officers.

As discussed below, we are satisfied beyond any doubt that Mrs. Cirrincione, at the time she was processing the application, knew that the building was a landmark. Further, on the morning Mrs. Cirrincione secured the permit, she met with Roppolo across the street from the site and then took a picture of the building. Mrs. Cirrincione, acting for Roppolo, had a duty to secure the Landmark Commission approval. Roppolo had a duty to insure that the Rincker House was not destroyed until the Landmark Commission had approved. To hold otherwise would make a mockery of existing city ordinances. The principle that everyone is presumed to know the law has been the cornerstone of our law far too long to require citation.

■ It therefore follows that the act of demolition was not induced by the employees of the city and Roppolo stood to gain, rather than lose, by the demolition. We find no basis for applying the estoppel theory.

We therefore reverse the judgment against Roppolo and Northwest and remand the matter to the circuit court of Cook County for trial on the question of damages.

II

Next we consider Mrs. Cirrincione. We think the record clearly established she knew the property was designated as a landmark. Two factors clearly support that contention. First, she inspected Rincker House prior to obtaining the demolition permit. The record is replete with evidence that signs were on the building indicating the landmark status. Although the fact that the photograph she allegedly took on the morning of the issuance of the permit and turned over the city was mysteriously missing, there is ample evidence to permit the conclusion the signs were on at the time she photographed it. Secondly, the records of Commonwealth Edison memorialized a telephone discussion with Mrs. Cirrincione on August 21, 1980, the day after the permit was issued, when the fact that there were landmark signs on the property was noted by Mrs. Cirrincione. And the record indicates

Cirro wanted the job as work had been slow during the summer of 1980.

■ Notwithstanding, there is nothing in the record to suggest Mrs. Cirrincione was aware of Roppolo's obligation to the city to move, restore and reconstruct the Rincker House. Consequently, one of the principal elements to establish fraud or constructive fraud upon the city is missing. For this reason, as to Mrs. Cirrincione, although we do not condone her actions, we conclude that the facts are missing for applying the constructive trust theory, or for finding fraud or constructive fraud. It follows that the same conclusion must be reached as to defendant Cirro.

### III

The city suggests it is entitled to damages by virtue of Roppolo's actions. The city suggests the cost to Roppolo of moving the Rincker House and reconstructing it as permitted by the Landmark Commission would have been $200,000 to $250,000. The city argues that by demolishing the building, Roppolo relieved himself of this financial obligation and was thereby unjustly enriched. In addition, the city points out that by the act of demolition, Roppolo caused the destruction of a part of Chicago's history and heritage that had existed for approximately 130 years.

We do not think the record before us is sufficient for this issue to be resolved at this time. For that reason, as to defendant Roppolo, we are remanding to the circuit court of Cook County the issue of damages.

### IV

#### CONCLUSION

Defendants Mrs. Cirrincione and Cirro urged certain trial errors relative to a motion for change of venue, denial of a jury request, and the trial court's errors in failing to quash a motion to dismiss and the certification as a class action. In view of our affirming the judgment as to Mrs. Cirrincione and Cirro, it is not necessary to discuss these issues.

The judgment of the circuit court of Cook County: (1) as to defendants Roppolo and Northwest National Bank of Chicago, as trustee under trust agreement dated March 1, 1978, is reversed and remanded for further proceedings in accordance with the views ex-

pressed herein; and (2) as to defendants Cirro Wrecking Co. and Lela Cirrincione, is affirmed.

Affirmed in part; reversed in part and remanded.

PERLIN, J., concurs.

JUSTICE STAMOS, dissenting:

The majority holds that the actions of Roppolo prior to the demolition of the Rincker House amount to a fraud and a constructive fraud, and that therefore the trial court erred in refusing to impose a constructive trust on the property where the Rincker House once stood. However, the evidence which was adduced at trial, taken with the stipulations of the parties, is not sufficient to establish a fraud or a constructive fraud. Because plaintiffs did not make out their cause of action, I would hold that the trial court correctly refused to grant the relief that they sought.

The majority holds that Roppolo is guilty of fraud in connection with the demolition of the Rincker House, stating that fraud is a generic term and quoting a general definition of fraud from *People ex rel. Chicago Bar Association v. Gilmore* (1931), 345 Ill. 28, 46, 177 N.E. 710. In *Gilmore*, the court was not required to determine if a cause of action for fraud had been proven by the party seeking relief. That case dealt only with the sanctions to be imposed on an attorney for professional misconduct, and the definition for fraud was given by the court while characterizing the pattern of deception, overreaching, and concealment which the respondent was found to have engaged in, and for which he was disbarred. However, when a plaintiff seeks legal or equitable relief from harm caused by actions of the defendant, it is not enough to characterize those actions as "fraudulent" in a generic sense. The plaintiff, rather, must prove the elements of a cause of action which will justify the court in granting the relief which is sought.

The essential elements of a cause of action for fraudulent misrepresentation are that:

(1) a statement of material fact was made;

(2) the statement was untrue;

(3) the party making the statement knew it was untrue or believed it to be so;

(4) the person to whom the statement was made believed it and relied on it, and was justified in doing so;

(5) the statement was made for the purpose of inducing the other party to act; and

(6) the reliance on the statement by the person to whom it was made cause his injury. See *Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 194-95, 380 N.E.2d 1040; *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 139, 213 N.E.2d 89.

Fraud does not always consist of an affirmative statement of fact; fraud may also consist of the concealment of a material fact accompanied by scienter, deception, and injury. (*Skidmore v. Johnson* (1948), 334 Ill. App. 347, 360, 79 N.E.2d 762.) However, where a failure to disclose information is the basis of the cause of action, there must be a duty to speak on the part of the silent party, and an active concealment of the pertinent fact. (See *Zanbetiz v. Trans World Airlines, Inc.* (1966), 72 Ill. App. 2d 192, 200-01, 219 N.E.2d 98.) Additionally, the facts which are not disclosed must not only be known to the silent party, but must be "unknown to or beyond the reach of" the party relying on the silence. (See *Lingsch v. Savage* (1963), 213 Cal. App. 2d 729, 738, 29 Cal. Rptr. 201, 206; Prosser, Torts sec. 106, at 697-98 (4th ed. 1971).) Each element of the cause of action for fraud must be proven by clear and convincing evidence. *National Republic Bank v. National Homes Construction Corp.* (1978), 63 Ill. App. 3d 920, 924, 381 N.E.2d 15.

Constructive fraud differs from actual or intentional fraud in that constructive fraud may be inferred from the facts and circumstances surrounding a transaction regardless of a lack of proof of any actual dishonesty of purpose. (See *In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 568, 378 N.E.2d 1345.) Constructive fraud is "often equated with a breach or abuse of a confidential or fiduciary relationship." (*Williams v. Estate of Cross* (1980), 85 Ill. App. 3d 923, 926, 407 N.E.2d 704.) Where a fiduciary or confidential relationship does not arise as a matter of law, such a relationship must be shown to have existed by clear and convincing evidence. (*Collins v. Nugent* (1982), 110 Ill. App. 3d 1026, 1036, 443 N.E.2d 277.) No Illinois cases have made a finding of constructive fraud in the absence of a showing that the parties stood in a confidential relationship. (See, *e.g., Neprozatis; Williams; Federal Life Insurance Co. v. Griffin* (1912), 173 Ill. App. 5, 18.) On the contrary, the absence of a fiduciary or a confidential relationship precludes the imposition of liability for a constructive fraud. (See *Gary-Wheaton Bank v. Burt* (1982), 104 Ill. App. 3d 767, 774, 433 N.E.2d 315.) Before turning to the question of whether Roppolo is guilty of an actual fraud with regard to the demolition of the Rincker House, it need be noted only briefly that there is nothing in

the record which would justify a conclusion that Roppolo stood in any type of confidential relationship with the city of Chicago, its employees, or its citizens, and therefore no constructive fraud can be inferred from the circumstances surrounding this case.

The majority refers to several of the acts and omissions of defendants in support of its conclusion that Roppolo's conduct meets the definition of fraud. The acts that the majority characterize as fraudulent are: (1) that Roppolo led Mrs. Cirrincione to believe that he was entitled to a demolition permit; (2) that Roppolo falsely induced the city to issue the permit; (3) that Roppolo, using Mrs. Cirrincione as an agent, omitted to advise the employees of the city of his agreement with the Planning Commission to restore the Rincker House; (4) that Roppolo had the duty to ensure that the Landmark Commission reviewed the application for the demolition permit, and that he failed to do so; and (5) that Mrs. Cirrincione, with the intent to mislead, failed to inform the city employees that the application was for a permit to demolish a landmark.

For Roppolo to be guilty of intentional fraud, it must be shown that he made some statement with the intent to deceive, and that that statement was relied upon by the city, inducing it to issue the permit. In the alternative, it must be shown that there was a concealment of a material fact which Roppolo had a duty to disclose, that the fact was unknown to the city, and that the city had a right to rely on Roppolo's silence. As was previously noted, each of the necessary elements must have been proven by clear and convincing evidence in order to justify a finding by this court that the verdict of the trial court was against the manifest weight of the evidence.

It cannot be gainsaid that Roppolo, by engaging Mrs. Cirrincione to apply for the permit and by neglecting to tell her that the building was a landmark for which no demolition permit would be issued, set in motion a series of events which led to the unlawful destruction of the Rincker House. It likewise cannot be gainsaid that the circumstances surrounding this case are of the type that naturally raise grave suspicions. However, suspicion is not the standard of proof in any civil or criminal proceeding in our courts, and suspicion is not clear and convincing evidence.

The first act that the majority characterizes as fraudulent is Roppolo's failure to inform Mrs. Cirrincione that he was not entitled to a permit to demolish the Rincker House. This failure to speak may or may not amount to a fraud on Mrs. Cirrincione. She had made it clear to Roppolo, through Rizzi, that she would not go through the application process unless she had a contract to perform the actual demoli-

tion. Had the permit been denied, Roppolo would have gained the benefit of Mrs. Cirrincione's efforts on his behalf for the price of executing a contract which could never be performed. However, it is difficult to see how Roppolo's lack of candor with Mrs. Cirrincione translates into a fraud on the city. It must be stressed that the fact that Roppolo made an application for the permit cannot be interpreted as a representation to the city that he was "entitled" to approval of the application. This is so because of the procedures which have been formulated by the city for dealing with properties which have been designated as landmarks.

A designation of a property as a landmark imposes a financial burden on the landowner. The landowner can shift some or all of that burden to the city by following the procedures set forth in chapter 21 section 21—64.1 of the Municipal Code of the City of Chicago. That section provides that when the Building Department receives an application for a permit to alter or demolish a designated landmark, it shall forward the application to the Landmark Commission. The Landmark Commission then considers the application and approves or disapproves it. A disapproval "shall not be deemed by the applicant for permit as a denial thereof." The Landmark Commission forwards the disapproved application to the finance committee of the city council. The finance committee must give the application prompt consideration, after which it recommends grant or denial of the application. If the committee decides that the application should be denied, its recommendation on the matter to the full city council must include a report on the ways and means by which the city can arrange to lease or sublease the landmark property, contract with the owner for covenants designed to preserve the landmark, acquire the property by eminent domain, or take other action under section 11—48.2—2 of the Illinois Municipal Code (Ill. Rev. Stat. 1981, ch. 24, par. 11—48.2—2). Courses of action available to the city under that statute include the creation of transferable development rights in favor of the owner of the landmark. After receiving the recommendation of the finance committee, the city council must pass an ordinance either approving the issuance of the permit or denying the permit. If the permit is denied, the city council must take one of the actions recommended by the finance committee with respect to the property. In short, the city cannot deny a permit to demolish a landmark without also taking action which will result in some form of compensation to the landowner for the burden imposed on him by the landmark designation. The only way to acquire this compensation is to apply for a permit to demolish the landmark. Any owner of a landmark-designated property

has the right to apply for a permit to demolish the landmark, and, as is obvious from the foregoing, he is well advised to do so. The mere act of applying for the permit cannot be construed as a representation to the city that the applicant is "entitled" to the issuance of the permit because the Municipal Code encourages him to make the application even if he knows to a certainty that it will be denied. Therefore, it cannot be concluded that Roppolo, by leading Mrs. Cirrincione to believe that he was entitled to a demolition permit, was making any representation which was calculated to deceive the city. It likewise cannot be concluded that Mrs. Cirrincione's belief in that entitlement in any way induced the city to issue the permit, because she would have handled the application process in the same way had she known the true facts and had she been expressly engaged only to begin the process in order to get the application before the city council.

The majority also holds that Roppolo, through Mrs. Cirrincione, falsely induced the city to issue the permit. In this regard, it must be stressed that Roppolo instructed Mrs. Cirrincione to use the 6366 address on the application despite Mrs. Cirrincione's suggestion that that was not the correct street address. This fact was not adduced through testimony at trial, but was stipulated to by the parties. That stipulation is binding on this court, and no inference contrary to the stipulation can be drawn on appeal. (See *Village of Schaumburg v. Franberg* (1981), 99 Ill. App. 3d 1, 4, 424 N.E.2d 1239.) It was also stipulated that Roppolo had twice before applied for demolition permits using the 6366 address. Both of those applications were made before the landmark designation. One permit was denied and one was revoked. It can only be concluded that Roppolo knew that a third application using that address would be rejected, but that he caused the permit to bear that address rather than the correct address. The inducement which caused the issuance of the permit was, in fact, not a result of any act of Roppolo's, but resulted from the changing of the address on the application at the direction of city employees. Roppolo's affirmative statements on the face of the application were an inducement to reject rather than to approve the application. The stipulated facts of this case negate any inference that Roppolo attempted to use deception to induce the city's actions.

The majority also asserts that Roppolo agreed in the application for the permit that all work pursuant to the permit would conform to the Municipal Code, and that therefore he had the duty to secure the approval of the Landmark Commission before demolishing the Rincker House. While it is true that no permit to demolish a landmark can issue without the approval of the Landmark Commission,

the Municipal Code does not impose on the applicant the duty of seeking the Commission's review of an application for a permit to alter or demolish a landmark. Chapter 21, section 21—64.1(b) of the Municipal Code provides that "prior to issuing any permit [for the alteration or demolition of a landmark], the Building Department shall forward any application for such permit *** to the Commission on Chicago Historical and Architectural Landmarks within (7) days of the receipt thereof."

The Building Department clearly has the obligation under the code to process the application in this fashion, and a failure to ensure that the Building Department is doing its job properly can hardly be characterized as a breach of a promise by an applicant for a permit that the work will be performed in compliance with the Municipal Code. The Building Department, by forwarding the application to the Landmark Commission, begins the administrative process which ultimately ends with compensation being paid to the owner of a landmark-designated property. Once the application is made, the process is out of the hands of the applicant. If everyone is presumed to know the law, then it cannot be said that Roppolo acted fraudulently by failing to do something that he knew that the city, and not he, was obliged to do.

The majority also characterizes two omissions of defendants as fraudulent. They are Roppolo's failure to disclose through his agent (Mrs. Cirrincione) that he had an agreement with the Planning Commission to move and restore the Rincker House, and Mrs. Cirrincione's failure to disclose to city employees at the permit control desk that the house was a designated landmark.

As has been previously noted, silence can amount to a fraud only when the silent party has a duty to speak. It is difficult to say that such a duty existed with regard to Roppolo's agreement with the Planning Commission. That agreement in no way affected Roppolo's right under the Municipal Code to apply for the permit and receive whatever compensation he might be awarded after the permit was denied. It is significant to note that the agreement with the Planning Commission does not specifically state that Roppolo would pay for the costs of moving and restoring the Rincker House, although it does state that Roppolo's company would perform the work. Therefore, an attempt by Roppolo to have the city assume part, if not all, of the expense of preserving the landmark is not only consistent with his rights under the Municipal Code, but is not in any way inconsistent with his agreement with the Planning Commission. The personnel at the permit control desk could not have refused to process the application had they known of that

agreement. This is not to say that they might not have processed it with greater care; but the conclusion that a person would have acted differently if a certain fact were known to him is a conclusion that the fact was material. A conclusion that a fact is material is only one element which must be proven to establish fraud. Although the fact may be regarded as material, Roppolo had no duty to disclose it. Additionally, the fact had little relevance to the application process. It must be reiterated that Mrs. Cirrincione was going through the application process in the expectation that she would perform the demolition contract, and that Roppolo was less than candid with her when he avoided informing her that the house was a landmark which was not likely to be demolished, but rather was to be moved and restored. However, it cannot be concluded that those omissions were calculated to deceive the city. It was stipulated between the parties that Roppolo instructed Mrs. Cirrincione to use the 6366 address on the application. By that act, he was providing the city with all the information it needed to determine that the structure was a landmark and that no demolition permit should be issued. Having disclosed all the material facts which were necessary for the city to handle the application correctly, Roppolo was under no duty to disclose more.

The foregoing discussion is equally applicable to the issue of whether Mrs. Cirrincione's failure to tell the city employees that the Rincker House was a landmark was a fraudulent concealment which can be imputed to Roppolo. Additionally, that omission cannot be characterized as a fraudulent concealment because such a concealment must be of a fact which was not only known to the silent party, but which was also unknown or unavailable to the party which relied on the silence. It is evident from the stipulated facts that the city, through its computerized record keeping system, has far superior access to facts concerning the status of any particular piece of property than does the applicant for a building permit. Both the 6366 address and the 6384 address were conspicuously visible on the application, and it would have been a simple matter to enter both addresses in the computer. Indeed, it would have been prudent to do so because the presence of the two addresses should have indicated to a reasonable person that there was some confusion concerning the correct address of the structure to be demolished. Because the facts not expressly disclosed to the city by defendants were readily accessible to the city, the failure to disclose those facts cannot be characterized as a fraud. It is also questionable whether the employees of the city department which collects, stores, and retrieves the information which the city claims should have been disclosed to those employees could ever be said to

have justifiably relied on the silence of an applicant for a permit. Therefore, it cannot be concluded that any of the omissions of defendants were of the type which support a finding that defendants perpetrated a fraud through their silence.

This case presents a set of facts which demand a choice between a determination that a series of unlikely fortuitous accidents and errors occurred and a determination that the destruction of the Rincker House was the result of fraudulent calculation and deception. The latter conclusion would comport with the natural suspicions that any reasonable person would entertain when confronted with the circumstances of this case. Truly, a determination that the destruction of the Rincker House was the result of inexplicable inadvertence rather than fraud seems naive at first blush. However, there is no alternative to that determination in the absence of clear and convincing evidence that a fraud was committed. No matter how suspicious the circumstances surrounding a transaction, the party complaining of the transaction is not released from the obligation to prove the elements of the cause of action.

Therefore, I would affirm.